IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION


PETER CHARLES KILPATRICK                                    PLAINTIFF


v.                        NO. 3:17-cv-00183 PSH


NANCY A. BERRYHILL, Acting Commissioner                     DEFENDANT
of the Social Security Administration


<u>MEMORANDUM OPINION AND ORDER</u>


Plaintiff Peter Charles Kilpatrick ("Kilpatrick") began the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Kilpatrick maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] It is Kilpatrick's contention that his residual functional capacity was erroneously assessed. Specifically, he maintains that the assessment is inconsistent with the opinions of his long-time treating physician, and the ALJ failed to provide good reasons for giving the physician's opinions only "partial weight." <u>See</u> Transcript at 29.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." <u>See</u> <u>Boettcher v. Astrue</u>, 652 F.3d 860, 863 (8th Cir. 2011).

Kilpatrick was born on October 8, 1969, and was forty-six years old on the day his application for disability insurance benefits was denied. He alleged that he became disabled beginning on August 1, 2014, as a result of, inter alia, morbid obesity, osteoarthritis, and pain in his right shoulder and back.

Kilpatrick ably summarized the evidence in the record, and the Commissioner did not challenge the summary. It will not be reproduced in full, except to note several matters germane to the issues raised in the parties' briefs.

The record reflects that Kilpatrick saw Dr. Roger Troxel, M.D., ("Troxel") on what appears to have been four occasions during 2013 for complaints that included right shoulder and back pain. See Transcript at 343 (01/10/2013), 342 (06/13/2013), 341 (10/07/2013), 340 (11/19/2013).[2] Troxel prescribed medication that included Flexeril, Vicodin, and Zanaflex. An x-ray was taken of Kilpatrick's right shoulder, and the results were unremarkable. See Transcript at 296-297. A CT scan of his cervical spine, though, revealed chronic degenerative changes. See Transcript at 336-337.

Kilpatrick appears to have seen Troxel on three occasions during 2014 for continued complaints of right shoulder and back pain. See Transcript at 335 (03/10/2014); 334 (07/09/2014); 333, 448-449 (12/02/2014). Kilpatrick diagnosed, inter alia, osteoarthritis and continued to prescribe medication for the pain.

Kilpatrick was also seen by Dr. Roland Cheng, M.D., ("Cheng") during 2014 for complaints of shoulder pain. See Transcript at 316 (01/28/2014), 314 (02/06/2014), 311-312 (03/06/2014), 308-309 (06/11/2014). Cheng's progress note from a March 6, 2014, examination is typical of his findings and observations; it included the following:

[2] Kilpatrick injured his right shoulder during his military service and in a 2013 automobile accident.

> [Kilpatrick] is complaining of pain in the right shoulder. He tried to play golf and still had this pain. He has a partial tear of the rotator cuff and also some widening of the AC joint. I told him just to take it easy and hopefully it would just get better completely. Will see him again for a checkup in three months.

See Transcript at 311. When Kilpatrick saw Cheng three months later, Kilpatrick continued to complain of right shoulder pain but reported that it was "a lot better." See Transcript at 308. Kilpatrick was continued on Meloxicam.

On June 10, 2015, Kilpatrick began receiving chiropractic treatment for his neck and back pain from Dr. Robert Shackleford, D.C., ("Shackleford"). See Transcript at 347-348. Shackleford observed that Kilpatrick was six feet, four inches tall; weighed 330 pounds; and had a heavy build with a protective gait. An examination of Kilpatrick's cervical spine revealed, in part, the following: "[t]he cervical paravertebral musculature, bilateral, was in spasm and painful to palpation;" cervical flexion elicited a "pain reaction;" and "[c]ervical compression was positive for bilateral nerve root compression." See Transcript at 347. In a Disability Determination form, Shackleford opined that Kilpatrick's physical impairments limited his ability to, inter alia, sit, stand, walk, lift, carry, push, pull, bend, squat, and reach above shoulder height. Shackleford additionally offered the following opinion: "Due to lumbar and lumbosacral instability as well as previous shoulder injury, [Kilpatrick] would have difficulty performing these tasks in a work setting." See Transcript at 346. Shackleford thereafter treated Kilpatrick on what appears to have been nineteen occasions between June 12, 2015, and May 23, 2016. See Transcript at 433-443. When Shackleford saw Kilpatrick on May 23, 2016, Kilpatrick reported that his back pain continued to be severe. See Transcript at 443.

On July 23, 2015, Troxel performed a general physical examination of Kilpatrick at the request of the state agency. See Transcript at 350-354. Kilpatrick summarized the relevant portions of Troxel's findings as follows:

> … Range of motion was decreased in the right shoulder at less than 90 degrees (normal is 150 degrees), in both hips and both knees with painful flexion at less than 120 degrees (normal is 150 degrees). Flexion and extension of the cervical spine was limited to less than 40 degrees (normal is 50 and 60 degrees, respectively), while rotation was less than 60 degrees bilaterally (normal is 80 degrees). Flexion of the lumbar spine was also limited although the actual number of degrees is illegible. Kilpatrick was unable to squat/arise from a squatting position.

See Docket Entry 20 at CM/ECF 6. Troxel diagnosed, inter alia, osteoarthritis and right shoulder pain. Troxel opined, though, that Kilpatrick had only a mildly limited ability to walk, stand, lift, and carry.

It appears that Kilpatrick did not see Troxel again until May 3, 2016, when Kilpatrick was seen for an injury to his "right quadriceps muscle and tendon complex." See Transcript at 445. Troxel prescribed Amlodipine and Tylenol with Codeine.

Also on May 3, 2016, Troxel completed a Medical Source Statement-Physical ("Statement") on behalf of Kilpatrick. See Transcript at 429-430. Troxel identified Kilpatrick's physical problems as right shoulder pain, lumbosacral spondylitis, and right leg and knee pain. Troxel opined that Kilpatrick could lift and carry ten pounds occasionally and less than ten pounds frequently, stand and walk for less than two hours in an eight-hour workday, and sit for about three hours in an eight-hour workday. Troxel also opined that Kilpatrick's ability to reach and handle was limited, Kilpatrick would require special accommodations at a workplace, and Kilpatrick's impairments and treatment would cause him to miss work more than three days a month.

Kilpatrick saw Dr. Roger Cagle, M.D., ("Cagle") on what appears to have been two occasions in 2015 for shoulder and low back pain. See Transcript at 358-361 (08/20/2015), 379-381 (09/29/2015). Kilpatrick had a normal range of motion in his extremities but a decreased range of motion in his right shoulder which made it difficult for him to raise his arm above his shoulder. Although he had a normal range of motion in his back, he could only bend forty-five degrees in the lumbar portion of his spine and had a poor ability to squat. Cagle diagnosed, inter alia, shoulder joint pain, lumbago, and "displacement of lumbar intervertebral disc without myelopathy." See Transcript at 380. Cagle prescribed medication and referred Kilpatrick to an orthopedic surgeon.

On September 16, 2015, an MRI was taken of Kilpatrick's right shoulder. See Transcript at 370. The results revealed a partial tear of the rotator cuff and moderate acromioclavicular joint degenerative changes. An MRI was taken of his lumbar spine, and the results revealed degenerative disc changes "most pronounced at L3-4 and L4-5," "[b]ilateral neural foraminal narrowing at L3-4 worse on the left than right," and "[m]ild bilateral neural foraminal narrowing at L4-5." See Transcript at 372.

On October 12, 2015, Kilpatrick began seeing an orthopedic surgeon, Dr. Travis Richardson, D.O., ("Richardson") for right shoulder and low back pain. See Transcript at 393-397. Kilpatrick's right shoulder was painful upon palpation and with weight bearing, and he had a decreased range of motion. His lumbar spine showed minor pain consistent with trigger points, paraspinal tenderness, and vertebral spine tenderness. Richardson prescribed medication and a lumbar sacral brace; scheduled Kilpatrick for lumbar epidural steroid injections, which he later received; and discussed the possibility of rotator cuff surgery.

Kilpatrick thereafter saw Richardson on what appears to have been seven occasions through June 6, 2016. See Transcript at 415-419 (03/14/2016); 476-480 (03/28/2016); 455, 462-466 (04/12/2016); 450-451 (05/10/2016); 578-580 (05/23/2016); 452-453 (05/25/2016); 574-576 (06/06/2016). During the period, Kilpatrick sought treatment for a right knee injury. See Transcript at 421-428. An MRI was taken of his knee, and the results revealed the following:

> Soft tissue edema with a full thickness rupture of the patellar tendon and retraction at the superior patellar region. Prominent degenerative changes and moderate joint effusion. Tear in the medial meniscus. Degenerative change of the medial and lateral compartments with chondrocartilage erosion, soft tissue edema.

See Transcript at 414. On the basis of the MRI results, Richardson diagnosed, inter alia, chronic pain syndrome, right quadriceps injury, chronic instability of the right knee, and unilateral primary osteoarthritis of the right knee. He recommended surgery, which was performed on April 12, 2016. Following the surgery, Kilpatrick's right leg was placed in a brace, and he was given a wheelchair. When Richardson saw Kilpatrick for a follow-up examination on May 23, 2016, Richardson made the following observations:

> 46-year-old white male that had quadricep tendon reconstruction. At this point, he is walking. His incision looks satisfactory. He is fearful to participate in physical therapy. In fact he has delayed it. He is scared that the quadricep tendon will once more … This is a possibility. I've also braced him for the fact that he will likely not have more than 45 to say 80? range of motion. I do believe that he will need further arthroscopy for the therapy and possibly an open quadriceps snipping … lengthening procedure. At this time, I suspect the patellar femoral or superior region has scarred down significantly after the quadricep tendon repair. As I stated to the patient, this will likely require long-term scope and manipulation in the first stages. Overall, he is satisfied with the pain, he is walking without a brace. We are encouraging him to start physical therapy. …

See Transcript at 578. Richardson subsequently ordered a round of injections for Kilpatrick and prescribed a three-prong cane. When Richardson saw Kilpatrick again on June 6, 2016, Richardson observed that Kilpatrick was walking with a limp and likely had quadriceps mechanism adhesions. Richardson opined the following: "[Kilpatrick] has a mobility limitation that significantly impairs his … ability to participate in one or more mobility-related activities of daily living … such as toileting, feeding, dressing, grooming, and bathing in customary locations in the home." See Transcript at 574-575.

Kilpatrick received physical therapy for his right leg/right knee problems for a period of what appears to have been from May 23, 2016, through July 18, 2016. See Transcript at 596-616. By the time of his last therapy session, his range of motion was roughly forty degrees, and he was slowly improving. He reported, though, that he could not do anything on his feet for too long because of swelling.

Kilpatrick was also seen for mental impairments during the time he was being seen for right shoulder, back, and right knee pain. See Transcript at 582-594. The mental impairments were most often characterized as a generalized anxiety disorder and depression. The progress notes from the examinations are relevant to his physical impairments because the notes reflect that he repeatedly complained of pain in his right shoulder, back, and quadriceps.

Kilpatrick's medical records were reviewed by state agency medical professionals during 2015. See Transcript at 69-80, 82-93. The medical professionals agreed that Kilpatrick retained sufficient residual functional capacity to perform a reduced range of light work, reduced primarily because of his difficulties reaching above his head.

A series of documents were completed by Kilpatrick or a state agency representation in connection with Kilpatrick's application. <u>See</u> Transcript at 189-253. In the documents, it was represented that Kilpatrick cannot stand for long periods of time, and his shoulder and back pain prevent him pushing, pulling, and holding objects. He also has difficulty squatting, twisting, and turning. He can attend to his personal care, prepare simple meals, perform simple house and yard work albeit for only a short period of time, and shop for groceries. Kilpatrick has no hobbies, although he does play cards. He cannot lift more than about five to ten pounds, and he can only walk for about one to two city blocks before he must stop and rest. He does not need an assistive device to walk.

The record contains a summary of Kilpatrick's work history. <u>See</u> Transcript at 174-186. The summary of his FICA earnings reflects that he had good earnings for the period between 2000 and 2012. <u>See</u> Transcript at 170.

Kilpatrick testified during the administrative hearing. <u>See</u> Transcript at 630-647. He stands six feet, four inches tall and weighs 355 pounds. He first injured his shoulder while serving in the military. He previously worked at Custom Pack as a machine operator. He was terminated after his pain became so great he could not perform the duties required of his job. Medication helps ease his pain, and he sometimes uses an assistive device to walk. Kilpatrick can attend to most of his personal care, but he cannot put his socks or shoes on without help. He can perform few household chores, particularly since his knee injury, and he cannot raise his right arm above his head. He cannot sit for longer than about thirty to forty-five minutes before he must re-adjust his position or otherwise stand up and move around.

The ALJ found at step two of the sequential evaluation process that Kilpatrick's severe impairments include osteoarthritis, cervical spine degenerative disc disease, lumbar spine spondylosis, chronic pain syndrome, right quadriceps tendon tear, and right shoulder tendon tear. The ALJ assessed Kilpatrick's residual functional capacity and found that he is capable of performing sedentary work except that he must sit or stand while performing his work duties. The ALJ also noted that Kilpatrick has the following additional physical limitations:

> … Further, the work must require no more than occasional overhead reaching; no climbing of ladders, ropes, and scaffolds; and no more than occasional performance of the remaining postural functions consisting of climbing of ramps and stairs, stooping, kneeling, crouching, and crawling. The work must require no balancing nor operation of foot controls. [He] must be able to use a cane if necessary to go to and from his workstation area. The work must not expose [him] to unprotected heights. …

See Transcript at 23. In so finding, the ALJ gave only partial weight to Troxel's opinions contained in his May 3, 2016, Statement. The ALJ provided the following reasons for so weighing Troxel's opinions:

> … the examination and opinion by Dr. Troxel does not contain a reason or analysis sufficient to support [Kilpatrick's] absence from work for treatment, inability to work an eight-hour day, or have limitations in all reaching, manipulation, and handling. [His] providers have not indicated that [he] needs to lie down during the workday, rather, he is able to walk without a cane. … [Kilpatrick's] physical therapist noted that [Kilpatrick] tolerated an increase in activity and a decrease in tightness in his quadriceps. … [Kilpatrick's] own reports show that he was not impaired in his ability to reach in all directions, handle, and finger as he is able to wash dishes, drive, and did not report problems picking up small items or dressing himself using buttons or tying laces. … Finally, this opinion is inconsistent with Dr. Troxel's prior Medical Source Statement from July 2015 concluding that [Kilpatrick] was only mildly limited in his ability to walk, stand, lift, and carry. …

See Transcript at 29. The ALJ found at step four that Kilpatrick is unable to perform his past relevant work but found at step five there is other work in the national economy Kilpatrick can perform.

Kilpatrick maintains that his residual functional capacity was erroneously assessed. It is Kilpatrick's contention that the assessment is inconsistent with Troxel's opinions, and the ALJ failed to give good reasons for weighing the opinions as he did.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Winn v. Commissioner, 2018 WL 3322247 (8th Cir. July 6, 2018). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id. "[W]hether the ALJ grants a treating physician's opinion[s] substantial or little weight, the regulations … provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) [quoting 20 C.F.R. 404. 1527(d)(2)].

The ALJ gave several reasons for discounting Troxel's opinions contained in the May 3, 2016, Statement. Some of the reasons are supported by substantial evidence on the record as a whole and are good reasons for giving Troxel's opinions only partial weight. The Court so finds for the following reasons.

First, the ALJ could and did discount Troxel's opinions because he did not provide a reason, or any analysis, within the four corners of the Statement to support his opinions. Troxel simply identified Kilpatrick's physical impairments, i.e., right shoulder pain, lumbosacral spondylitis, and right knee and leg pain, and offered opinions as to the work-related limitations they cause. Troxel did not make specific mention of the findings and observations he relied upon in offering the opinions. It is also noteworthy that Troxel identified Kilpatrick's impairments to include right knee and leg pain, but Kilpatrick was seen for those impairments primarily by Richardson. There is no indication that Troxel reviewed Richardson's progress notes in forming opinions as to the work-related limitations caused by Kilpatrick's right knee and leg pain.

Second, notwithstanding the foregoing, the Court accepts that Troxel's opinions in the May 3, 2016, Statement are but one part of a larger record and should be read in the context of the entire record. The ALJ could and did nevertheless find that the opinions are inconsistent with the opinions Troxel offered approximately nine months earlier. Kilpatrick saw Troxel on what appears to have been four occasions during 2013 and what appears to have been three occasions during 2014. The last time Kilpatrick saw Troxel in 2014 appears to have been on December 2, 2014. The next time Kilpatrick saw Troxel appears to have been on July 23, 2015, at which time Troxel opined that Kilpatrick had only a mildly limited ability to walk, stand, lift, and carry. Kilpatrick did

not see Troxel again until May 3, 2016, or approximately nine months later, at which time Troxel opined that Kilpatrick's work-related limitations were quite severe, e.g., Kilpatrick could only lift and carry ten pounds occasionally and less than ten pounds frequently, stand and walk for less than two hours in an eight-hour workday, and sit for about three hours in an eight-hour workday. Troxel offered no explanation for why his opinions of Kilpatrick's limitations changed so dramatically between July 23, 2015, and May 3, 2016. It is true that Kilpatrick was seen on May 3, 2016, for an injury to his "right quadriceps muscle and tendon complex," but there is nothing to indicate that the injury caused his limitations to change so drastically.

Third, the ALJ could and did find that Troxel's opinions contained in the May 3, 2016, Statement are inconsistent with the results of the medical testing. For instance, medical testing of Kilpatrick's right shoulder performed on September 16, 2015, revealed no "full-thickness rotator cuff tear" but instead revealed a "[l]ow-grade partial thickness articular surface tear of [the] supraspinatus ..." and "moderate acromioclavicular joint degenerative changes." See Transcript at 370. Medical testing of his back performed the same day revealed degenerative disc changes in his lumbar spine with evidence of only mild to moderate bilateral neural foraminal narrowing. An MRI of Kilpatrick's knee revealed impairments requiring surgery, which was performed on April 12, 2016. In a post-operative note, Richardson observed that "[o]verall, Kilpatrick was satisfied with the pain" and was "walking without a brace." See Transcript at 578. The ALJ appears to have credited the results of the medical testing and could properly do so. There is nothing to suggest that he ignored or otherwise improperly discounted the results of the medical testing.

Fourth, the ALJ could and did find that the Troxel's opinions contained in the May 3, 2016, Statement are inconsistent with the findings and observations of other medical professionals or, at a minimum, the opinions are but one part of a larger, inconsistent record capable of more than one acceptable characterization. For instance, Kilpatrick saw Cheng for right shoulder pain during 2014. Kilpatrick reported doing "a lot better" after a period of treatment. See Transcript at 308.

In a Disability Determination form, Shackleford opined that Kilpatrick's physical impairments limited his ability to perform work-related activities. Shackleford additionally opined that "[due] to lumbar and lumbosacral instability as well as previous shoulder injury, [Kilpatrick] would have difficulty performing [the] tasks in a work setting." See Transcript at 346. The form, though, is not dated. It is not impossible that the form was prepared on or about June 10, 2015, as it appears to be part of a progress note from that date. See Transcript at 345-348. If the form was indeed prepared on or about June 10, 2015, the representations contained in it are suspect as they are inconsistent with the opinions Troxel offered on July 23, 2015, opinions in which Troxel opined that Kilpatrick had only a mildly limited ability to walk, stand, lift, and carry.

A physical therapist treated Kilpatrick's right leg/right knee problems for a period of what appears to have been from May 23, 2016, through July 18, 2016. By the time of the last therapy session, Kilpatrick's range of motion was approximately forty degrees, and he was slowly improving. He reported, though, that swelling in his feet prevented him from standing for too long. It is possible to construe the therapist's findings and observation in such a way as to be inconsistent with the severe limitations found by Troxel.

The question at bar is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, "[a] reviewing court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision." See Id. [internal quotations and citations omitted]. Here, the evidence is capable of more than one acceptable characterization. Although the Court might have decided the case differently, the ALJ could find as he did with respect to Troxel's opinions contained in the May 3, 2016, Statement and, ultimately, with respect to Kilpatrick's residual functional capacity. In short, Kilpatrick has not shown how the ALJ erred in weighing Troxel's opinions or in assessing Kilpatrick's residual functional capacity.

Given the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Kilpatrick's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 10th day of October, 2018.

_____
UNITED STATES MAGISTRATE JUDGE